**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jennifer Swanson, | No. CV-24-08077-PCT-SHD |
| Plaintiff, | **ORDER** |
| v. | |
| Arizona Board of Regents, | |
| Defendant. | |

Pending before the Court is Defendant Arizona Board of Regents ("the Board") motion for summary judgment on Plaintiff Jennifer Swanson's claims.  (Doc. 37.)  For the following reasons, the Board's motion will be **granted**.

## I.    FACTUAL BACKGROUND

Swanson was employed with Northern Arizona University ("NAU") as a non-tenure track ("NTT") professor of Photography in its School of Communication.  In May 2020, during the COVID-19 pandemic, NAU declined to renew her employment contract for the subsequent academic year.  Swanson alleges that NAU did not renew her contract based on her sex, in violation of Title VII of the Civil Rights Act of 1964.  The following facts are derived from the parties' statement of facts and evidence, and are undisputed unless otherwise noted.

### A.    NAU's Structure and Funding

NAU is a public university composed of multiple colleges. (Doc. 37-2 at 3.) NAU's College of Social and Behavioral Sciences ("College") includes the School of

Communication. (*Id.*) The School of Communication offers six programs: Creative Media and Film, Communication Studies, Journalism, Photography, Strategic Communication, and Visual Communication. (*Id.* at 5.)

During the relevant period, Karen Pugliesi served as Dean of the College. (*Id.* at 4.) During Pugliesi's tenure as Dean, the School of Communication had two Directors: Norm Medoff, who was in place when Pugliesi started, and Brant Short, whose term entirely overlapped with Pugliesi's. (*Id.* at 5.) The School of Communication also had program coordinators for each of its six programs. (*Id.* at 26.) Coordinators were typically selected by their faculty peers in each program. (*Id.* at 27.) Director Short testified that coordinators served as "reporter[s] and organizer[s]," assisting with course scheduling and communicating program needs, including equipment and budget matters. (*Id.* at 27.) Although coordinators participated in discussions regarding teaching assignments, Director Short testified that they did not have independent authority to assign courses, and that he retained responsibility for ensuring that teaching assignments fit within the overall schedule. (*See id.*)

NAU is a tuition-dependent institution, deriving approximately eighty percent of its operating funds from tuition and fees, and the remaining twenty percent from state appropriations. (*Id.* at 11.) As a result, fluctuations in enrollment cause corresponding fluctuations in funding. (*Id.*)

### B.    Swanson's Employment at NAU

On August 24, 2015, Swanson began working for NAU as an NTT Lecturer in the School of Communication. (*Id.* at 75.) As an NTT faculty member, Swanson was subject to NAU's Conditions of Faculty Service (the "Conditions"). (*Id.* at 53.) The Conditions provide that NTT appointments carry no expectation of continued employment beyond the end of the current appointment. (*Id.* at 53.) Swanson's initial appointment letter also stated that her appointment was eligible for renewal "contingent upon effective performance, the continued availability of funds, and program needs." (*Id.* at 75.) Swanson testified, however, that when she was hired, then-Director Medoff advised her that so long as she

performed up to expectations, "you keep your job." (Doc. 43-2 at 29–30.) NAU renewed Swanson's appointment four times—in 2016, 2017, 2018, and 2019. (Doc. 37-2 at 88, 90–93.) During her employment, Director Short and Dean Pugliesi gave Swanson positive performance evaluations. (*Id.* at 36.)

In her early years at NAU, Swanson taught courses in both the Photography and Journalism programs. (*Id.* at 29, 52–53.) During her first year, NAU awarded her an internal grant to support her dissertation work. (*Id.* at 57.) The Board alleges that by the 2018–2019 academic year (*i.e.*, fall 2018, spring 2019), Swanson taught courses exclusively within the Photography program. (Doc. 37 at 3; Doc. 37-2 at 44.) Swanson disputes that characterization and contends that her service obligations extended beyond the Photography program. (*See* Doc. 43 Plaintiff's Separate Statement of Facts in Opposition to Motion for Summary Judgment ("PSOF") ¶ 16.)

In 2019, during her fifth year of teaching, NAU permitted Swanson to apply for a promotion to Senior Lecturer—one year earlier than the standard timeline under the Conditions. (Doc. 37-2 at 54.) Swanson testified that she negotiated this early eligibility with then-Director Medoff at the time of her hire. (*Id.* at 55.) As part of the promotion review process, Dean Pugliesi wrote: "I am pleased to inform you that I am endorsing your request for promotion to the rank of Senior Lecturer effective academic year 2020-2021." (*Id.* at 123.) Director Short similarly wrote that he had reviewed Swanson's application and agreed with the faculty status committee's recommendation and offered his endorsement for Swanson's promotion to Senior Lecturer. (*Id.* at 125.) Amy H.[1], a Photography faculty member, also wrote a letter supporting Swanson and stated that she is "thankful [Swanson] is part of the photo faculty." (Doc. 43-2 at 167.) The record reflects that, but for the COVID-19 pandemic, this promotion would have become effective in the 2020–2021 academic year. (Doc. 37-2 at 119.)

Swanson took medical leave for the first half of the Spring 2020 semester and did not teach during that period. (Doc. 37-2 at 66.) Because NAU was managing the COVID-

---

[1] To protect the privacy of individuals referenced herein, the Court refers to non-party individuals by their first name and last initial only.

- 3 -

19 crisis, Director Short assigned her non-teaching projects upon her return, including preparing marketing materials and developing safety guides for Photography courses. (*Id.* at 39.)

### C.    COVID-19 and Budget Reductions

In March 2020, the COVID-19 pandemic prompted NAU to enter what Director Short described as a "crisis time." (*Id.* at 39.) Around spring break, NAU leadership met to address the immediate ramifications of the pandemic, including how to manage the approximately 10,000 students expected to return to campus. (*Id.* at 10, 39.) NAU ultimately transitioned to online instruction for the remainder of the Spring 2020 semester. (*Id.* at 11, 42.)

On April 9, 2020, Director Short emailed School of Communication faculty informing them that COVID was impacting student enrollment. (*Id.* at 67–68, 98.) He noted "a lot of uncertainties" about NAU's path forward and cautioned that classes might need to be combined, cancelled, or moved online. (*Id.* at 98.) By mid-April 2020, NAU was forecasting up to a thirty-percent decrease in enrollment, and by late April, NAU was preparing for significant budget cuts. (*Id.* at 10–11.)

On April 30, 2020, Director Short informed the School of Communication faculty that NAU did not know how courses would be delivered in the fall, whether fully online degree programs would be permitted, how many classes would be cancelled or reassigned, or what staffing reductions might occur. (*Id.* at 133.) Around that time, Dean Pugliesi instructed each program within the College to eliminate nonessential course offerings and to plan for a twenty-five percent reduction in enrollment and thirty to thirty-five percent reduction in courses for first-year students. (*Id.* at 12, 100–103.) Dean Pugliesi testified that she led a comprehensive review of course schedules, faculty assignments, and potential organizational changes prior to undertaking any faculty cuts. (*Id.* at 12.) Dean Pugliesi testified that the review required compiling and analyzing a lot of data, and that that she asked Associate Dean Dayle Hardy-Short "to work with each chair and director and to . . . look at the data in gory detail." (*Id.*) Swanson disputes that NAU followed this

process, but fails to rebut it with any evidence (and her response itself is poorly drafted and somewhat incomprehensible). (PSOF ¶ 45 ("Admit that Pugliesi testified that this was part of the process to determine how to cut staff in light of the budget crisis. Deny that this was in fact NAU or CSBS followed this the process.").)

Dean Pugliesi initially developed a budget reduction plan that did not impact personnel. (Doc. 37-2 at 11.) That proposal was rejected because NAU required reductions from the state-funded portion of the budget, more than ninety-five percent of which consisted of employee salaries. (*Id.*) Dean Pugliesi then consulted with department chairs and directors regarding potential personnel reductions, asking "[w]hat would be the areas that we could reduce if we had to?" (*See id.* at 40.)

Based on information from chairs and directors, Dean Pugliesi developed multiple budget reduction scenarios reflecting low, medium, and high levels of cuts. (*Id.* at 17.) She first eliminated approved but unfilled positions. (*Id.* at 13–14.) She then reduced college operational funding. (*Id.* at 14.) After those steps, she began the process of selecting NTT faculty for non-renewal. (*Id.*)

According to Dean Pugliesi, her personnel decisions were guided by three criteria: (1) immediate program needs; (2) long-term strategic impact; and (3) faculty performance. (*Id.*) She testified that "immediate need" referred to the minimum faculty staffing necessary to meet the consolidated course schedule. (*Id.*) She described "strategic impact" as a faculty member's long-term ability to advance academic programs, contribute to experiential learning initiates, and support administrative or operational needs. (*Id.*) She testified that the strategic impact assessment "happened mostly in dialogue and conversations." (*Id.* at 14.) With respect to performance, Dean Pugliesi testified that all but one NTT faculty member had positive evaluations. (*Id.* at 14–15.) The male NTT professor who did not receive positive evaluations was selected for non-renewal. (*Id.* at 17.) Swanson disputes that NAU applied these criteria to inform the non-renewal of NTT faculty, except for the one faculty member who lacked a positive performance rating. (PSOF ¶ 57.)

- 5 -

**D.** **Selection of Swanson for Non-Renewal**

With respect to Swanson's non-renewal, Dean Pugliesi testified that she consulted with department chairs, directors, and other NAU leadership to determine which NTT faculty positions could be eliminated with the least harm to the institution. (Doc. 37-2 at 14–15.) She also worked with Director Short to determine program-level needs. (*Id.* at 40–41.) Director Short was not asked to identify specific faculty members for non-renewal; rather, he identified programs that could sustain reductions. (*Id.*) Director Short identified the Journalism and Photography programs as areas where a faculty line could potentially be eliminated, citing declining enrollment in those programs. (*Id.* at 40.) Swanson disputes that characterization and asserts that Photography enrollment had increased in the years preceding 2020. (Doc. 43-2 at 17, 171.)

At the time of the 2020 reductions, the Photography program employed three NTT faculty members: Swanson, Eric O., and Amy H. (Doc. 37-2 at 16.) Eric O. taught at NAU since 2015 and served as Photography program coordinator for several years. (*Id.* at 105–107; Doc. 46-1 at 26.) Amy H. began teaching at NAU in 2010 and previously served as Photography coordinator. (Doc. 37-2 at 109–113; Doc. 46-1 at 26.) It is undisputed that Amy H. was regarded as one of the strongest teachers in the School of Communication. (Doc. 46-1 at 26; *see* PSOF ¶ 71.)

Dean Pugliesi made the final determinations regarding which NTT faculty members would not be renewed. (Doc. 37-2 at 41.) Four faculty members in the School of Communication were not renewed—three women and one man, including Swanson. (*Id.* at 45.) When Dean Pugliesi provided Director Short with the list of individuals selected for non-renewal, including Swanson, Director Short agreed with the selections and later testified that they "ma[de] sense" to him. (*Id.*) Director Short also testified, however, that he did not know why Swanson, specifically, had been selected for non-renewal. (*Id.* at 44.)

The Board contends that, in determining which NTT position to eliminate within Photography, decisionmakers considered faculty roles, course coverage, and anticipated programmatic impact. (*See id.* at 12, 41, 47.) Swanson disputes that those criteria were

applied in selecting her for non-renewal. (PSOF ¶¶ 73, 76.)

When asked about the gender composition of the non-renewals, Director Short testified that it did not concern him because he was "focused on the impact on the school, and . . . on the individuals in terms of what they were teaching and how we could move forward." (Doc. 37-2 at 45.)  Similarly, Dean Pugliesi testified that she was not concerned that more women than men were selected for non-renewal because she saw no evidence of disparity or discrimination in the process. (*Id.* at 18.)  Swanson disputes both of those assessments.  (PSOF ¶¶ 74–75.)

Swanson's employment in the School of Communication ended on May 8, 2020. (*See* Doc. 37-2 at 88.)

## II.    PROCEDURAL HISTORY

Swanson initiated administrative proceedings by filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sex, age, and disability discrimination, as well as retaliation.  (Doc. 1 at 2; Doc. 10 at 2.)  On January 23, 2024, the EEOC issued its right to sue notice informing Swanson of her right to initiate a lawsuit against the Board.  (Doc. 1 at 2–3; Doc. 10 at 2.)

Swanson filed this action on April 22, 2024 alleging only sex discrimination and retaliation.  (Doc. 1.)[2]  On August 22, 2025, the Board filed its motion for summary judgment.  (Doc. 37.)  Swanson responded, (Doc. 42), and the Board replied, (Doc. 46). The parties did not request oral argument, and the Court does not believe oral argument is necessary, so this motion is decided without holding a hearing.  *See* LRCiv 7.2(f).

## III.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

---

[2]    Swanson subsequently elected not to pursue her retaliation claim and moved to dismiss that claim.  (Doc. 30.)  The Court denied the parties' stipulation of dismissal because Federal Rule of Civil Procedure 41(a) does not permit dismissal of individual claims. (Doc. 33 (citing *Hells Canyon Preservation Council v. U.S. Forest Serv.*, 403 F.3d 683, 687–88 (9th Cir. 2005)).)  Swanson has since confirmed that she does not intend to pursue the retaliation claim.  (*See* PSOF ¶ 4.)  Accordingly, the Court will grant summary judgment in favor of the Board on Swanson's abandoned retaliation claim.

- 7 -

of law." Fed. R. Civ. P. 56(a). Not all factual disputes are material or genuine, however: a "fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). Courts "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference[s] in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

At summary judgment, there are shifting burdens of production. A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the "moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). At bottom, the Court's "inquiry as to whether a genuine issue exists will be whether the evidence presented is such

that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

## IV.   DISCUSSION

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of race, color, religion, sex, or national origin.   42 U.S.C. § 2000e–2(a). Disparate-treatment claims under Title VII "require the plaintiff to prove that the employer acted with conscious intent to discriminate." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 854 (9th Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805–06 (1973)).   In the absence of direct evidence of discrimination, the plaintiff may rely on the burden-shifting framework of *McDonnell Douglas Corp. v. Green* to establish discriminatory treatment.   411 U.S. at 802.

The Board contends that Swanson produced no direct evidence of discrimination and thus the *McDonnell Douglas* test applies.   (Doc. 37 at 10 (citing *McDonnell Douglas*, 411 U.S. at 802)).   Swanson does not argue that she has direct evidence of discrimination, and also relies on the burden-shifting test in *McDonnell Douglas*.   (*See* Doc. 42 at 7–8.) The Court agrees with the Board and will apply *McDonnell Douglas* because there is no direct evidence of discrimination.

### A. *McDonnell Douglas* Framework

Under the *McDonnell Douglas* burden-shifting framework for disparate treatment cases, the plaintiff must first establish a prima facie case of discrimination.   *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010).   To establish a prima facie case, a plaintiff must show: "(1) that they are members of a protected class; (2) that they were qualified for their positions and performing their jobs satisfactorily; (3) that they experienced adverse employment actions; and (4) that similarly situated individuals outside their protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination."   *Id.*   at 1156 (cleaned up).   "At the summary judgment stage, the requisite degree of proof necessary to establish a prima facie case is minimal and does not even need to rise to the level of a

preponderance of the evidence." *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (cleaned up).

If a plaintiff establishes a prima facie case, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123–24 (9th Cir. 2000). If the employer meets this burden, the burden shifts back to the plaintiff to "demonstrate that the proffered nondiscriminatory reason is merely a pretext for discrimination." *Lyons*, 307 F.3d at 1112.

At the summary judgment stage, the plaintiff does not have to prove that the employer's reason for firing them was pretext for discrimination, but the plaintiff must introduce evidence sufficient to raise a genuine issue of material fact as to whether the employer's reason was pretextual. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000). To do this, the plaintiff must offer "specific, substantial evidence of pretext." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994) (quoting *Steckl v. Motorola*, 703 F.2d 392, 393 (9th Cir. 1983)). "The plaintiff may show pretext either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable." *Dominguez-Curry v. Nev. Transp. Dep't.*, 424 F.3d 1027, 1037 (9th Cir. 2005) (citation omitted).

### B.   Step 1: Prima Facie Case

The Board does not dispute that Swanson can satisfy the first three elements of a prima facie case under *McDonnell Douglas*: (1) that she is a member of a protected class, (2) that she was qualified for her employment position; and (3) she experienced an adverse employment action. (Doc. 37 at 11.) The Board contends, however, that Swanson cannot satisfy the fourth prong of her prima facie case because she has not identified any similarly situated employees outside her protected classes who were treated more favorably. (*Id.*)

### 1. Identification of Similarly Situated Non-Class Employees Treated More Favorably

Swanson identifies Eric O. and David H.—male NTT faculty in the School of Communication whose contracts were renewed for the 2020 academic year—as similarly situated individuals outside her protected class who were treated more favorably.  The record establishes that both Eric O. and David H. were retained for the 2020 academic year while Swanson's contract was not renewed, thereby satisfying the "more favorable treatment" component at this stage.  The remaining question is whether Eric O. and David H. are similarly situated to Swanson in all material respects.

At the summary judgment stage, whether employees are similarly situated is ordinarily a question of fact.  *Beck v. United Food & Com. Workers Union Local 99*, 506 F.3d 874, 885 n.5 (9th Cir. 2007).  "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003).  "The employees need not be identical; they must simply be similar 'in all *material* respects.'" *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1125 (9th Cir. 2009) (quoting *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006)).  "[W]hat facts are material will vary depending on the case." *Hawn*, 615 F.3d at 1157.

#### a. Eric O.

NAU contends that Eric O. is not similarly situated to Swanson because they held different appointment titles and Eric O. had additional leadership and supervisory responsibilities that Swanson did not.  (Doc. 37 at 12–13.)  NAU notes that Eric O. held the title of Assistant Professor of Practice, while Swanson was a Lecturer, and these positions fall within distinct appointment tracks with different qualifications and expectations.  (*Id.* at 12.)  NAU further emphasizes that Eric O. served as Photography program coordinator and exercised supervisory responsibilities that Swanson did not.  (*Id.* at 12–13.)

Swanson, in contrast, asserts that both she and Eric O. were NTT faculty in the Photography program, reported to the same director, carried 80/20 teaching-service workloads, and were hired through the same job posting and hiring process.  (Doc. 42 at

9–10; *see* Doc. 43-2 at 7–8.) She also asserts that neither she nor Eric O. had a multi-year appointment covering the 2020 academic year, so both were considered for nonrenewal, and that NAU allegedly applied the same nonrenewal criteria to each of them. (Doc. 42 at 9; Doc. 37-2 at 16; *see* Doc. 43-2 at 161–62.)

Although Eric O. and Swanson held different appointment titles and Eric O. had supervisory responsibilities that Swanson did not, a reasonable jury could find that these differences do not preclude a finding that the two were similarly situated. *See Belloni v. Roman Catholic Archbishop of San Francisco*, 2015 WL 106587, at *11 (N.D. Cal. 2015) ("[T]he Ninth Circuit does not require that employees have the same position to be similarly-situated."). Swanson alleges that both she and Eric O. were NTT faculty in the Photography program without multi-year appointments, reported to the same director, carried similar teaching-service workloads, and were hired through the same process. In light of these undisputed similarities, whether Eric O. and Swanson were similarly situated presents a factual question for the jury. On this record, the Court cannot conclude as a matter of law that Eric O. is not similarly situated to Swanson.

b.    <u>David H.</u>

NAU argues David H. is not an appropriate comparator because (1) he worked exclusively in the Journalism program while Swanson worked in the Photography program; (2) his primary duty was to run the NAU student newspaper, which the Board contends was very different from Swanson's job duties; and (3) NAU had determined that it needed to separately cut an NTT position in both the Journalism and Photography. (Doc. 37 at 11–12.)

Although David H. and Swanson worked in different programs, Swanson alleges that both were NTT faculty within the School of Communication with one-year contracts and were required to teach four classes per semester. (Doc. 43-2 at 9–10.) She also alleges that she had previously received an assignment as an advisor to the NAU student newspaper and had the capacity to teach classes in both the Photography and Journalism programs. (*Id.* at 10.)

While NAU contends that cross-program comparisons are inappropriate due to program-specific reductions, the record—viewed in Swanson's favor—permits a reasonable inference that the nonrenewal decision was made at the School of Communication level based on criteria applied generally to NTT faculty.  Director Short testified that he identified the Journalism and Photography programs as areas where a faculty line could potentially be eliminated due to declining enrollment.  (Doc. 37-2 at 40.)  There is no evidence of a formal policy requiring the elimination of one faculty member from each program.

Swanson has presented sufficient evidence that she and David H. were similarly situated within the School of Communication, including that they had similar job duties and displayed similar conduct.  *Belloni*, 2015 WL 106587, at *11.  In light of these alleged similarities, whether David H. and Swanson were similarly situated presents a factual question for the jury.

### C.     Step 2: Articulation of a Legitimate, Nondiscriminatory Reason for the Board's Actions

Because Swanson produced evidence sufficient to establish a prima facie case under *McDonnell Douglas*, "[t]he burden of production, but not persuasion, . . . shifts to [the Board] to articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang*, 225 F.3d at 1123–24.  The Board has satisfied this burden by explaining that Swanson's non-renewal was driven by the financial and operational impacts of the COVID-19 pandemic.  In response to anticipated decreases in enrollment and corresponding budget shortfalls for the 2020 academic year, NAU implemented a plan to reduce costs, including the reduction of NTT faculty positions.  NAU contends that in making renewal decisions, Dean Pugliesi was guided by three criteria: (1) short-term institutional needs; (2) strategic impacting, *i.e.*, long-term ability to advance NAU's programs; and (3) performance.  (Doc. 37 at 2.)[3]  The Board asserts that the program

---

[3]     Although Swanson disputed that Dean Pugliesi considered these criteria, she relied only on the testimony of Director Short, who was not involved in identifying faculty who would not be renewed, and did nothing to dispute that Dean Pugliesi made the non-renewal decision and relied on the stated criteria.  (PSOF ¶ 47.)

directors and department leadership consulted and determined Swanson's position could be eliminated because the Photography program "had dwindling enrollment, excess faculty, and functioned without her during the spring 2020 semester." (*Id.*)

### D.    Step 3: Evidence That the Board's Stated Reasons Are Pretextual

Because the Board has articulated legitimate, nondiscriminatory reasons for Swanson's non-renewal, the burden shifts back to Swanson to demonstrate that those reasons are pretextual. *Freyd v. Univ. of Or.*, 990 F.3d 1211, 1228 (9th Cir. 2021). Pretext may be established either: (1) "directly, by showing that unlawful discrimination more likely motivated the employer;" or (2) "indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Chuang*, 225 F.3d at 1127 (quotation marks omitted). When only circumstantial evidence of pretext is available, such evidence must be "specific" and "substantial." *Wallis*, 26 F.3d at 890; *see also Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (holding that a plaintiff "must produce evidence in addition to that which was sufficient for her prima facie case in order to rebut the defendant's showing" of non-discriminatory purpose).

An employer's disregard for its own company policies, or failure to follow its normal practices, is evidence of pretext. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1117 (9th Cir. 2011) ("A plaintiff may also raise a triable issue of pretext through evidence that an employer's deviation from established policy or practice worked to her disadvantage."); *Diaz v. Eagle Produce, Ltd.*, 521 F.3d 1201, 1214 (9th Cir. 2008) (holding that reasonable jurors could conclude that deviating from company policy "undermines the credibility of the proffered explanations"). Additionally, "[a] showing that [the employer] treated similarly situated employees outside [the plaintiff's] protected class more favorably would be probative of pretext." *Vasquez*, 349 F.3d at 641.

#### 1.  Same Actor Inference

The Board asserts that "Swanson's burden to establish pretext is particularly challenging because the facts of this case give rise to the 'same actor inference' in [the

Board's] favor." (Doc. 37 at 14.) The Ninth Circuit has held that "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270–71 (9th Cir. 1996). The same-actor inference is based upon the principle that "an employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1096 (9th Cir. 2005). The Ninth Circuit has also held that the same-actor inference applies when, aside from hiring, the same actor promotes or takes other favorable action toward the plaintiff. *Id.* at 1097.

The Board contends that Dean Pugliesi is entitled to the same-actor inference because she both advocated for Swanson's promotion to Senior Lecturer and later decided not to renew her contract. (Doc. 37 at 14.) Swanson asserts that the inference does not apply because the *decision-makers* for the two actions were not identical. (Doc. 42 at 13.)

It is unclear whether the same-actor inference applies here. Although Dean Pugliesi participated in the promotion process and expressed strong support for Swanson's candidacy, the Board has not shown that she was the sole or final decision-maker with respect to the promotion. *See Plutt v. Safeway, Inc.*, 2006 WL 2091673, at *2 n.1 (D. Ariz. 2006) (finding that the same actor inference does not apply where the same actor was involved in both decisions, but was not the final decision maker); *but see Green v. Vilscack*, 2024 WL 4124172, at *6 (D. Mont. 2024) (holding "the same person does not need to make the adverse employment decision for the same actor inference to apply"). In any event, whether the same actor inference applies need not be resolved because Swanson has failed to adduce sufficient evidence that the Board's reasons were pretextual.

## 2. Pretext

Swanson does not rely on direct evidence of discriminatory animus to allege the Board's reasons for the non-renewal of her contract are pretextual. (*See* Doc. 42 at 10–12.) Instead, she contends that the Board's stated reasons are unworthy of credence. (*Id.*)

- 15 -

Accordingly, the question is whether she has produced "specific" and "substantial" circumstantial evidence from which a reasonable jury could conclude that the Board's articulated explanation was not the true reason for its decision. *Wallis*, 26 F.3d at 890.

The Court therefore examines each of Swanson's asserted bases for pretext—including her arguments regarding course reassignment, the treatment of under-enrolled and elective classes, the evaluation of strategic contributions, and the selection process itself—to determine whether, considered individually or collectively, they raise a genuine dispute of material fact as to whether the Board's proffered explanation was pretextual.

a.      Alleged Failure to Consider Reassignment

Swanson first contends that NAU evaluated only whether her assigned courses could be redistributed to other faculty but did not assess whether she could assume courses assigned to David H. or Eric O.  (Doc. 42 at 11.)  She points to her prior teaching history and asserts she was qualified to teach the courses those individuals ultimately taught during the 2020 academic year.  (*Id.*)

As an initial matter, Swanson does not present any evidence that NAU did not consider whether she could teach other faculty's courses.  (PSOF ¶¶ P46–48).  But even accepting that Swanson was qualified to teach the courses assigned to David H. and Eric O., this does not, without more, demonstrate pretext.   The relevant inquiry is not whether NAU could have performed its assessment differently, and thereby conclude that Swanson should be retained, but rather whether the Board's stated reasons for selecting Swanson—reliance on institutional need and strategic considerations—were false.  Swanson identifies no policy requiring NAU to displace other NTT faculty to preserve her appointment, nor does she present evidence that NAU deviated from such a policy when it instead reassigned her courses to other faculty.

At most, Swanson's argument reflects disagreement with NAU's staffing judgment. Such disagreement does not constitute evidence that the proffered explanation was false or pretextual. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (holding "courts only require that an employer honestly believed its reason for its actions,

even if its reason is foolish or trivial or even baseless" (cleaned up)).

### b.    Retention of Under-Enrolled and Elective Courses

Swanson next contends that NAU asserted it would eliminate under-enrolled courses and electives yet continued offering some such courses during the 2020 academic year. (Doc. 42 at 11.)  She points to other under-enrolled or elective courses offered by retained faculty in the 2020 academic year, including those taught by alleged comparators Eric O. and David H. (*Id.*)  She argues this inconsistency suggests that she was selected first and the justification supplied afterward. (*Id.*)

The record does not support that inference.  First, this argument is based on an incorrect premise—Swanson cites no evidence for the proposition that NAU asserted that all under-enrolled or elective courses would be categorically eliminated.  Indeed, Swanson does not identify evidence that NAU adopted a mandatory rule requiring elimination of every under-enrolled course, nor does she demonstrate that retained courses were materially indistinguishable in enrollment, function, or strategic importance.

Second, Swanson conflates course elimination decisions with NTT position non-renewals.  These are two distinct determinations, and the only one pertinent here is the latter. With respect to the non-renewals, Dean Pugliesi undertook a multifactor analysis that considered course sequencing, programmatic necessity, and long-term strategic impact, (*see* Doc. 37-2 at 14).  Swanson does not demonstrate that these processes were governed by identical criteria, nor does she show that the retention of certain courses undermines the application of the three criteria used in evaluating her non-renewal.  While Swanson notes that some under-enrolled or elective courses continued to be offered in academic year 2020, this does not provide evidence that her non-renewal was inconsistent with the Dean's articulated reasoning.

Because the Dean testified that NTT non-renewal decisions were based on short-term institutional needs, long-term strategic impact and faculty performance, and not on whether specific courses were eliminated or retained, there is no evidence of deviation from NAU's established criteria.  Accordingly, the continued offering of some elective or under-

enrolled courses does not render the Board's explanation internally inconsistent. *See Earl*, 658 F.3d at 1117.

### c. Strategic Impact and Comparative Contributions

Swanson also argues that NAU's stated reliance on long-term strategic impact was pretextual, citing her record of contributions including modernizing the student newspaper, creating a study abroad opportunity, updating courses with multimedia and experiential elements, requiring student exhibitions, and applying technological expertise. (Doc. 42 at 12.) She asserts that "[t]here is no record of similar accomplishments by [Eric O. or David H.], or even a comparison of their varying capacities to contribute to the advancement of the Photography or Journalism programs over time." (*Id.*)

Even crediting Swanson's evidence of her accomplishments, the record reflects competing assessments of the NTT faculty's relative strengths and roles within the program. The fact that Swanson believes her contributions were more significant does not demonstrate that the Board's evaluation of faculty in terms of their ability to advance programs over time or to support long-term programmatic goals was dishonest. Courts have held that an employee's subjective evaluation of her own performance, without additional evidence of discriminatory intent, is insufficient to raise a triable issue on pretext. *See Bradley*, 104 F.3d at 270 (holding that "an employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact"). Nor does the absence of written comparative documentation establish that no evaluation occurred, particularly where testimony reflects that much of the "strategic impact" assessment took place through dialogue and consultation among leadership. (Doc. 37-2 at 14.)

Accordingly, Swanson has not produced specific and substantial evidence from which a reasonable jury could conclude that NAU's explanation regarding strategic impact was pretextual.

### d. Lack of a Specific Explanation for Swanson's Selection

Finally, Swanson contends that NAU's decision to not renew her was pretextual

because the university never explained why she was selected over other members in the School of Communication. (Doc. 42 at 12.) She emphasizes that COVID-related staff reductions, decreased enrollment, and anticipated budget constraints did not make her an inevitable or necessary choice for non-renewal. (*Id.*) She asserts that "colleagues with more limited academic and experiential breath—such as [Eric O. and David H.]—were more obvious candidates for non-renewal under NAU's own criteria." (*Id.*) Swanson further emphasized that Director Short testified he did not know why she, specifically, had been selected for non-renewal, and she argues that NAU never articulated a clear reason distinguishing her from the other faculty. (*Id.*)

The evidence, however, shows that Dean Pugliesi made the final personnel determinations after consulting with program leadership regarding which programs could sustain reductions. (Doc. 37-2 at 41.) Consistent with that structure, Director Short testified that he was not asked to identify a specific individual for non-renewal. (*Id.* at 40–41.) His lack of knowledge about the precise comparative calculus does not contradict the Board's articulated criteria nor does it demonstrate that the explanation was fabricated. Additionally, Swanson's argument that Eric O. and David H. were the more obvious candidates rests entirely on her own deposition testimony and subjective assessment. *See Bradley*, 104 F.3d at 270 (an employee's subjective assessment of her own competence does not create a triable issue).

Considered individually and collectively, Swanson's evidence does not demonstrate internal inconsistency, deviation from established policy, clearly superior qualifications, or more favorable treatment of similarly situated male faculty. Each of her purported pretext arguments relies on subjective assessments or minor perceived inconsistencies, none of which undermine the legitimacy of the Board's stated rationale. Accordingly, Swanson has not produced specific and substantial evidence of pretext. No reasonable jury could conclude on this record that the Board's stated reasons were unworthy of credence or that sex discrimination was the true basis for the non-renewal decision. As a result, the Board is entitled to summary judgment.

Accordingly,

**IT IS ORDERED** that the Board's motion for summary judgment (Doc. 37) is **GRANTED**.  Summary judgment is entered in favor of the Board on all claims, including Swanson's claims for sex discrimination and retaliation in violation of Title VII.

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment accordingly and close this case.

Dated this 27th day of February, 2026.

Honorable Sharad H. Desai
United States District Judge